**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
                                   )
JAMES ROBERT ADAMS,                )
                                   )
            Plaintiff,             )
                                   )   Civil Action No. 05-73 (EGS)
        v.                         )
                                   )
MARTINSVILLE DUPONT CREDIT UNION,  )
                                   )
            Defendant.             )
_____)
```

<u>**MEMORANDUM OPINION**</u>

Plaintiff John Robert Adams commenced this action against the Martinsville Dupont Credit Union ("Martinsville" or "Credit Union") to recoup funds that were withdrawn from his checking account as a result of the Credit Union honoring stolen checks. Plaintiff also seeks additional relief for other damages he allegedly suffered. Pending before the Court is defendant's Motion for Summary Judgment, and plaintiff's cross Motion for Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. Upon consideration of the motions, the responses and replies thereto, and the applicable law, the defendant's motion is **GRANTED** in part and **DENIED** in part, and plaintiff's cross motion is also **GRANTED** in part and **DENIED** in part.

**I.   Background**

Martinsville is a financial institution headquartered in Martinsville, Virginia. The Credit Union is federally insured by

the National Credit Union Association, and has annual audits conducted by an independent accounting firm, as well as a surety bond to insure against robbery, forgery and dishonesty.

Plaintiff was a resident of the District of Columbia from approximately February 2001 through October 2005, and a member of the Credit Union during the relevant time period.  Plaintiff signed a Share Draft Agreement with Martinsville, in which he acknowledged that any objection to the monthly statement would be waived unless made in writing to the Credit Union within thirty days of when the statement was mailed.  Plaintiff, however, alleges that bank statements he received monthly amended the Share Draft Agreement, in that it provided that customers had up to sixty days to report inaccuracies on their bank statements.[1]

On Friday, February 15, 2002, plaintiff's automobile was vandalized and several items were stolen from his vehicle, including his checkbook containing check numbers 1305-1330. Plaintiff notified the Credit Union of the theft on Saturday, February 16, 2002.  Plaintiff contacted the Credit Union again on Tuesday, February 19, 2002, which was the next regular business

---

[1] The back of plaintiff's bank statement reads as follows: This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.  NOTIFY US IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR STATEMENT. If you think your statement is wrong or if you need more information about a transaction on your statement, write us on a separate sheet at the address listed on your statement. Write us as soon as possible.  We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

Pl.'s Mot. for Summ. J. Ex. 4.

day, and spoke with Terry Hammond, the Controller of the Credit
Union.  Plaintiff alleges that Hammond told him that he would not
be held responsible for the stolen checks and that the checks
would be flagged so that they would not be paid.  Pl.'s Opp'n 7.
Martinsville denies that Hammond made either of those statements
to the plaintiff.  Def.'s Rep. 3.

On or about February 21, 2002, four checks from the stolen
checkbook, check numbers 1306-1309, were written at Giant Food,
and on or about March 1, 2002, plaintiff was contacted by Giant
Food regarding those checks.  On or about March 3, 2002,
plaintiff contacted the Credit Union to report the fraud on check
numbers 1306-1309.  In response, the Credit Union sent plaintiff
an affidavit of forgery to complete, as well as a stop payment
order, for check numbers 1305 through 1330.[2]  The stop payment
order expired by its own terms six months later, on September 15,
2002, and was not renewed by plaintiff.  The Credit Union alleges
that plaintiff was given the option to close his checking
account.  *See* Def.'s Mot. for Summ. J. 8.  Plaintiff, however,

---

[2] The stop payment order signed by plaintiff on March 15, 2002, stated:
Please stop payment on the draft described above, unless you
have already paid, certified or accepted it.  I understand
that this written request will cease to be effective six
months from the date shown below unless it is previously
cancelled or renewed in writing by me.  Martinsville will not
be liable for the payment of the draft contrary to this
request unless payment is caused by Martinsville's negligence
and causes actual loss to me.  Martinsville's liability shall
not, in any event, exceed the amount of the draft.  I agree to
reimburse Martinsville for any loss it sustains in honoring
this request.
Def.'s Mot. for Summ. J. Ex. D.

denies that he was presented with that option, and alleges that the Credit Union actually advised him against freezing his account.  *See* Pl.'s Opp'n 5.

Between July 25 and July 27, 2003, eight checks from the stolen checkbook were written on plaintiff's account (check numbers 1313-1320), in the amount of $5,926.19.  These checks will be referred to as the "July 2003 checks."  The Credit Union honored the July 2003 checks and debited them from plaintiff's account.  The statements reflecting the July 2003 checks were mailed to plaintiff on or around August 5, 2003 and September 5, 2003.[3]  On or about October 15 and 16, 2003, two more checks were forged on plaintiff's account (check numbers 1325 and 1327) in the amount of $1,053.28.  The statement reflecting the October 2003 checks was mailed to plaintiff on or around November 5, 2003.  On December 5, 2003, plaintiff reported the October 2003 checks to the Credit Union, and in January 2004, plaintiff reported the July 2003 checks.  The total value of the checks in dispute is $6,979.47.

On April 21, 2004, plaintiff wrote a letter to Hammond directing the Credit Union to contact a series of check

---

[3] Check numbers 1313, 1315, 1316, 1314, 1320 and 1319, in the amounts of $745.59, $300.00, $1568.70, $1754.52, $103.00, and $515.00, were negotiated between July 25 and 27, 2003.  These checks were reflected on a statement dated July 31, 2003, which was mailed to plaintiff on or around August 5, 2003.  Two additional checks cleared on August 1, 2003, check numbers 1318 and 1317, in the amounts of $310.43 and $628.98, and were reflected on the statement dated August 31, 2003, which was mailed on or around September 5, 2003.

verification companies, including ChexSystems, and report the theft of the checks from his Share Draft Account.  On April 23, 2004, plaintiff wrote another letter to Hammond directing the Credit Union to notify the check verification companies referenced in the previous letter that, as a result of his stolen checks, plaintiff's "checking account had been closed due to theft and fraud."

On April 23, 2004, Minniear, a Martinsville employee, wrote a letter to plaintiff advising him that the Credit Union had reported his account as closed to two of the companies referenced, ChexSystems and Equifax, and further advising him that reporting the information as he requested would likely not lead to his desired result.  Based on plaintiff's request in his letter of April 23, 2004, Sharon Clark, the Credit Union's Member Services Manager, wrote a letter to ChexSystems on April 27, 2004, requesting that ChexSystems flag plaintiff's account as "closed due to fraud."

In September 2005, the Credit Union accessed plaintiff's ChexSystems report.  The Credit Union contends that it accessed the report in response to a complaint by plaintiff's counsel that ChexSystems was reporting inaccurate information, as relayed by the Credit Union.  Def.'s Mot. for Summ. J. 11-12.  According to the Credit Union, it accessed plaintiff's report to confirm whether ChexSystems was accurately reporting the information the

Credit Union had provided in April 2004, namely that plaintiff's account was closed by plaintiff because of fraudulent activity (i.e., the presentment of fraudulent checks).  *Id.*

Plaintiff contends, however, that the Credit Union's justification for checking his ChexSystem report is factually inaccurate.  Plaintiff alleges that he did not become aware that inaccurate information appeared on his ChexSystem report until October 5, 2005, one week after the Credit Union accessed his report.  Pl.'s Opp'n 6-7.  According to plaintiff, his counsel did not inform the Credit Union that false information appeared on Adam's ChexSystems report until October 11, 2005, more than two weeks after the report had been accessed.  *Id.*

## II.  Standard of Review

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).  In determining whether a genuine issue of material fact exists, the Court must view all facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. Analysis

On July 13, 2006, plaintiff filed a Second Amended Complaint asserting the following claims against Martinsville: (1) violations of the Uniform Commercial Code ("U.C.C."); (2) Negligence; (3) Conversion; (4) Breach of Contract; (5) Breach of Fiduciary Duty; (6) Deceptive Advertising; (7) Unlawful Trade Practices; (8) Negligent Misrepresentation, Deceit, Fraud, and Constructive Fraud; (9) Bad Faith; (10) Covenant of Good Faith and Fair Dealing; (11) Defamation; (12) Emotional Distress; (13) another count of Defamation; (14) Violations of the Fair Credit Report Act ("FCRA"); and (15) Invasion of Privacy.  Compl. ¶¶ 32-65.  Plaintiff seeks restitution in the amount of $6,979.47 for the fraudulent checks honored by Martinsville, as well as consequential, punitive, and treble damages in excess of $600,000.  Compl. at 13.

Martinsville maintains that it is entitled to partial summary judgment on Count I of plaintiff's second amended complaint on the grounds that plaintiff did not satisfy his reporting requirement under the U.C.C. and the Share Draft Agreement for the eight checks written in July 2003. Martinsville also seeks summary judgment on Counts II through XV for the following reasons: (1) plaintiff's common law claims for negligence and conversion are preempted by Virginia's adoption of the U.C.C.; (2) plaintiff's claims for breach of contract, breach

of fiduciary duty, deceptive advertising, unlawful trade practices, and defamation lack factual and legal support; (3) plaintiff's claims for negligent misrepresentation, bad faith, breach of covenant of good faith and fair dealing, emotional distress are not recognized as independent causes of action under Virginia law; (4) plaintiff's additional claim for defamation, and well as his claim for invasion of privacy, should be dismissed because they are preempted by the FCRA; and (5) plaintiff's claims for violations of the FCRA fail because the Credit Union had a permissible purpose for accessing plaintiff's ChexSystem report.  *See* Def. Mot. for Summ. J. 1.

Plaintiff moves for summary judgment on Count I of the Second Amended Complaint arguing that he satisfied his reporting obligations under the U.C.C., and thus the Credit Union is liable for honoring the stolen checks.  *See* Pl.'s Mot. for Summ. J. 1.

### A.    Diversity Jurisdiction and Choice of Law

The Court has subject matter jurisdiction over this action due to diversity jurisdiction.  Plaintiff was, at the time he filed this lawsuit, a resident of the District of Columbia.  The Credit Union is a corporation with its principal place of business in Martinsville, Virginia.  The amount in controversy exceeds $75,000.

In a diversity action, "[f]ederal courts apply the choice of law principles of the jurisdiction in which they sit."  *GEICO v.*

*Fetisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992).  "The District of
Columbia follows a modified 'interests analysis' approach to
choice of law.  Under this approach, the first step is to
determine whether a 'true conflict' exists – that is, whether
more than one jurisdiction has a potential interest in having its
law applied and, if so, whether the law of the competing
jurisdiction is different." *Id.; see also Shapiro, Lifschitz &
Schram, P.C. v. Hazard*, 24 F. Supp. 2d 66 (D.D.C. 1998).  Only
after the determination of whether a "true conflict" exists
between the laws of two jurisdictions will a court determine
whether another jurisdiction has a more substantial interest in
the dispute.  *GEICO*, 958 F.2d at 1141; *Hazard*, 24 F. Supp. 2d at
74.

There are several counts alleged in plaintiff's complaint
that are not recognized as causes of action in the State of
Virginia, even if they are recognized as a cause of action in the
District of Columbia.  Where a cause of action exists in one
jurisdiction, but is not recognized as a cause of action in
another, it is axiomatic that a true conflict of law exists.

Next the Court considers which jurisdiction has a more
substantial interest.  *GEICO*, 958 F.2d at 1141.  Virginia has an
interest in regulating the conduct of parties within its
territory and providing redress for injuries, if any, that
occurred therein.  Specifically, the initial injury at issue in

9

this case occurred when Martinsville failed to return or otherwise credit the stolen funds to plaintiff's checking account.  As the account is located in Virginia, any injury suffered by plaintiff as a result of Martinsville's refusal to re-credit his account also occurred in Virginia.  Further, plaintiff's account, as well as the Credit Union and its officers, are located in Virginia.  It follows that any action or inaction taken by Martinsville with regard to the account also took place in Virginia.  Finally, the relationship between the parties, a credit union and its customer, is centered in Virginia.

Plaintiff alleges only limited contacts with the District of Columbia: that he was domiciled in the District at the time that his checkbook was stolen, and that the alleged theft of the checks from his automobile occurred in the District.  Standing alone, these allegations are insufficient to support a conclusion that the District of Columbia has a more substantial interest in having its laws applied.  Accordingly, Virginia law shall be applied to all claims set forth in the Second Amended Complaint.

**B.   Count I (Violations of the U.C.C.)**[4]

Virginia Code § 8.4-406 governs a customer's duty to

---

[4] Virginia law undisputedly applies to Count One of plaintiff's second amended complaint, as both Virginia and the District of Columbia have adopted the U.C.C. provision that states "[t]he liability of a bank for action or non-action with respect to an item handled by it for purposes of presentment, payment or collection is governed by the law of the place where the bank is located."  D.C. Code § 28.4102(b); Va. Code Ann. § 834-102(b).

discover and report an unauthorized signature, and the bank's liability for making unauthorized payments.[5]  Virginia Code § 8.4-406(c), the provision upon which plaintiff relies, provides that a customer must exercise reasonable promptness in examining the statement and promptly notify the bank of any unauthorized payments.  *See* Va. Code Ann. § 8.4-406(c)(2007).  If the customer fails to do so, he is precluded from asserting his unauthorized signature against the bank on any item which the bank paid in good faith.  *See* Va. Code Ann. § 8.4-406(d).  Nonetheless, if a

---

[5]  Virginia Code § 8.4-406 provides in relevant part:

(c) If a bank sends or makes available a statement of account . . ., the customer must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized. If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant items.

(d) If the bank proves that the customer failed with respect to an item to comply with the duties imposed on the customer by subsection (c) the customer is precluded from asserting against the bank:

(2) the customer's unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank if the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, not exceeding thirty days, in which to examine the item or statement of account and notify the bank.

(e) If subsection (d) applies and the customer proves that the bank failed to exercise ordinary care in paying the item and that the failure substantially contributed to loss, the loss is allocated between the customer precluded and the bank asserting the preclusion according to the extent to which the failure of the customer to comply with subsection (c) and the failure of the bank to exercise ordinary care contributed to the loss. If the customer proves that the bank did not pay an item in good faith, the preclusion under subsection (d) does not apply.

(f) Without regard to care or lack of care of either the customer or the bank, a customer who does not within one year after the statement or items are made available to the customer (subsection (a)) discover and report the customer's unauthorized signature on or any alteration on the item is precluded from asserting against the bank the unauthorized signature or alteration.

precluded customer proves that the bank failed to exercise ordinary care in paying the item and that the bank's failure substantially contributed to plaintiff's loss, the loss is allocated between the customer and the bank. *See* Va. Code Ann. § 8.4-406(e).

The Virginia code further provides that the customer must report any inaccuracies within one year of receiving the statement, though this period may be shortened through a contractual agreement between a bank and its customer. *See* Va. Code Ann. § 8.4-406(f). *See also Nat'l Title Ins. Corp. Agency v. First Union Nat'l Bank*, 559 S.E.2d 668, 671 (Va. 2002)(holding that a bank and its customer could validly agree to reduce the time period within which the customer was obligated to report any unauthorized signatures from its account from one year to sixty days). Here, plaintiff signed a Share Draft Agreement with Martinsville that provided that "[a]ny objection respecting any item shown on a monthly statement of this account shall be waived unless made in writing to Martinsville on or before the thirtieth day following the day the statement is mailed."[6]  Def.'s Mot. for Summ. J. Ex. B.

---

[6] Plaintiff contends that this Share Draft Agreement was superceded by the notice provided on the back of his bank statement each month, which stated that customers must inform the Credit Union of any inaccuracies within sixty days, rather than thirty days.  That argument, however, is irrelevant with respect to the facts of this case because plaintiff either reported the unauthorized payments within thirty days of receiving his statement or well beyond sixty days.

Plaintiff's checkbook was stolen on February 21, 2002.  On March 15, 2002, plaintiff signed a stop payment order, which expired by its terms on September 15, 2002.[7]  Between July 25 and July 27, 2003, more than ten months after the stop payment order had expired, eight checks were written from plaintiff's stolen checkbook in the amount of $5,926.17.  These checks appeared on plaintiff's August and September 2003 statements.  According to the Share Draft Agreement, plaintiff should have reported the unauthorized payments from the July 2003 checks to Martinsville by no later than October 2003.  On October 15 and 16, 2003, two more checks were written from the stolen checkbook in the amount of $1,053.28.  These unauthorized checks appeared on plaintiff's November 2003 statement, and according to the Share Draft Agreement, plaintiff should have reported the unauthorized payments from the October 2003 checks to Martinsville by no later than December 2003.

On December 5, 2003, within thirty days of receiving his November 2003 statement, plaintiff notified the Credit Union of the unauthorized October 2003 checks.  Therefore, plaintiff met his reporting requirements pursuant to U.C.C. and the Share Draft

---

[7] Plaintiff argues that he satisfied his reporting requirement by reporting that the checks were stolen before they were used.  Virginia Code § 8.4-406(c), however, clearly states that customers "must exercise reasonable promptness in examining the statement to determine whether any payment was not authorized."  At the time that plaintiff first notified the Credit Union in 2002, no unauthorized "payments" had been made, thus plaintiff's interpretation of the statute is inaccurate.

Agreement for the October 2003 checks and is entitled to partial summary judgment on Count I in the amount of $1,053.28.[8]

In January 2004, plaintiff notified the Credit Union of the unauthorized July 2003 checks that appeared on his August and September 2003 statements.[9]  The defendant argues that because plaintiff did not meet his reporting requirement, he is precluded from asserting his authorized signature on the July 2003 checks against the bank.  Although the Credit Union is correct that plaintiff failed to meet his reporting requirements, Virginia law provides that even when a customer is precluded from asserting his unauthorized signature against the bank, if the bank failed to exercise ordinary care in paying the item, the loss is allocated between the customer precluded and the bank.  Va. Code § 8.4-406(e).

It is uncontroverted that plaintiff notified Martinsville on multiple occasions that his checks had been stolen.  Plaintiff also signed a stop payment order for the stolen checks on March 15, 2002.  Material questions of fact exists as to whether the

---

[8] Defendant argues that summary judgment should be denied on the October checks to determine if plaintiff is contributorily liable because he failed to promptly notify the Credit Union of the unauthorized July checks.  Va. Code § 8.4-406(e) provides for contributory negligence only when the reporting requirements have not been met.  Because plaintiff did fulfill his reporting requirements with respect to the October checks, that provision is not applicable.

[9] January 2004 is also more than sixty days from when plaintiff received the September 2003 statement.  Thus, plaintiff's argument that the Share Draft Agreement was superceded by the notice on the back of plaintiff's bank statements stating that customers have sixty days to report inaccuracies is irrelevant.

Credit Union exercised ordinary care in protecting plaintiff's bank account.   Plaintiff alleges that if the Credit Union had exercised ordinary care, it would have closed plaintiff's checking account when the account's security was breached, or flagged plaintiff's account to notify the bank when checks from the stolen checkbook were used.   Genuine issues of material fact exist as to whether defendant exercised ordinary care in honoring the July 2003 checks.   Thus, the Court shall deny the defendant's motion for summary judgment with respect to the July 2003 checks.

### C.   Counts II (Negligence) and III (Conversion)

In Counts II and III of the Second Amended Complaint, plaintiff asserts common law claims against Martinsville for negligence and conversion alleging that the Credit Union negligently honored the forged checks, took inadequate actions to protect his account, wrongfully withheld plaintiff's funds and converted those funds for its own benefit.   Compl. ¶¶ 35-38. Defendant contends that pursuant to Virginia Code Ann. § 8.1A-103(b), plaintiff's negligence and conversion claims are preempted by the U.C.C.[10]   Plaintiff argues that the U.C.C. does not completely preempt his common law claims of negligence and conversion.   Plaintiff further argues that his claims for negligence and conversion arise from a separate factual and legal

---

[10]   Virginia Code Ann. § 8.1A-103(b) states, "Unless displaced by the particular provisions of this subtitle, the principles of law and equity . . . shall supplement its provisions."

basis than his U.C.C. claims because Counts II and III concern the Credit Union's duties when faced with identify theft and compromised accounts.

The Court first notes that both the U.C.C. and the common law provide plaintiff with avenues of recovery for Martinsville's alleged wrongful conduct.[11]  In instances where both laws provide a means of recovery, it has been generally held that the U.C.C. displaces the common law to ensure uniformity, which the adoption of the U.C.C. was designed to achieve.  *See Equitable Life Assurance Society of the U.S. v. Okey*, 812 F.2d 906, 909 (4th Cir. 1987).

Virginia courts have consistently held that claims for negligence and conversion are preempted by the U.C.C.  *See Halifax Corp. v. Wachovia Bank, N.A.,* 604 S.E.2d 403, 409-11 (Va. 2004) (holding that Virginia UCC displaces common law claim for conversion); *Halifax Corp. v. First Union Nat'l Bank*, 546 S.E.2d 696, 704 (Va. 2001) (holding that Title 8.4, which "delineates the rights of a customer against its drawee bank for the improper payment of checks drawn on the customer's account," displaces a common law contract claim); *Brar v. Signet Bank*, 35 Va. Cir. 52, 54 (Va. Cir. Ct. 1994) ("The U.C.C.'s comprehensive coverage of

---

[11]  Virginia Code § 8.4A-406, governs the relationships between a bank and its customers and provides redress for a bank's negligence in honoring forged checks.  Virginia Code § 8.3A-420 dictates the liability that is imposed for conversion of a negotiable instrument.

the negligence theory of recovery supports a finding that the common law has been displaced."); *Jefferson Nat'l Bank v. First Virginia Bank*, 29 Va. Cir. 296, 298 (Va. Cir. Ct. 1992) (holding that the U.C.C. has replaced any common law negligence action with a statutory remedy of conversion).  Accordingly, as plaintiff's claims are comprehensively covered by the U.C.C., he is limited to the remedies provided therein, and his common law claims for negligence and conversion shall be dismissed with prejudice.

### D.   Count IV (Breach of Contract)

In Count IV, plaintiff alleges that Terry Hammond, on behalf of Martinsville, made a verbal "contract" with him to return the $1,053.28 taken from his account for the two checks written in October 2003, and that the Credit Union did not honor this promise.  Compl. ¶ 40.

To maintain a claim for breach of contract plaintiff must demonstrate that there was: (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of the obligation.  *See Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004).

Defendant contends that plaintiff failed to establish that consideration existed for the promise allegedly made by Martinsville, through its agent, Hammond.  Plaintiff argues that

17

his continued business was consideration for Martinsville's alleged promise.  The Court finds that a question of material fact exists as to whether plaintiff's continued business constituted sufficient consideration to create a contract that the Credit Union would return the funds from the October 2003 checks.  Thus, defendant's motion for summary judgment with respect to Count IV shall be denied.

### E.   Counts V (Breach of Fiduciary Duty)

In Count V of plaintiff's complaint, plaintiff alleges that the Credit Union breached the duties owed to him as a customer and as a member by withholding the funds rightfully due him, by inadequately protecting his account, and by advancing spurious defenses to its actions.  Compl. ¶¶ 41-43.  These allegations, however, do not give rise to a claim for breach of fiduciary duty in Virginia because Virginia law does not recognize a fiduciary relationship between a bank and its customers.  *Deal's Adm'r v. Merch. & Mech. Savings Bank*, 91 S.E. 135 (Va. 1917).  In *Deal's Adminstrator*, the Supreme Court of Virginia plainly held that "[t]he relation between a bank and a depositor is that of debtor and creditor. The deposit creates an ordinary debt, not a privilege or right of a fiduciary character." *Id.* at 135.  While plaintiff alleges that the relationship between a credit union and its depositors differs from a typical bank-customer relationship because depositors become part owners of the

18

institution, a trust relationship is not created by this sort of arms-length transaction.  *See Muir v. Navy Fed. Credit Union*, 2005 U.S. Dist. LEXIS 3559, No. 03-1193, at *5 (D.D.C. March 1, 2005) (dismissing fiduciary duty claims against a Virginia credit union on the grounds that "[a]s a general matter, a financial institution does not have a fiduciary duty to its depositors") (citing *Geiger v. Crestar Bank*, 778 A.2d 1085, 1091 (D.C. 2001)). As such, the allegations set forth in Count V of the Second Amended Complaint do not state a claim for breach of fiduciary duty, and shall therefore be dismissed with prejudice.

   **F.   Count VI (Deceptive Advertising)**

   In Count VI of plaintiff's complaint, deceptive advertising, plaintiff alleges that Martinsville "inaccurately and deceptively described the stability and protections covering members' accounts" on its website, in mailings, and in solicitations, and that plaintiff entrusted his funds with Martinsville in reliance upon these statements.  Compl. ¶¶ 22-24, 45.

   Virginia law recognizes a cause of action for deceptive advertising pursuant to Virginia Code § 18.2-216 and § 59.1-68.3. Virginia Code § 18.2-216 states that the use in any advertisement of "any promise, assertion, representation or statement of fact which is untrue, deceptive or misleading," made with the "intent to sell" or "to induce the public" to enter into an obligation, is prohibited.  Va. Code Ann. § 18.2-216 (2007) (making it

unlawful to publish an advertisement containing untrue, deceptive or misleading statements and classifying such actions as a Class one misdemeanor).  Any person who suffers a loss as a result of false advertising may bring an individual action to recover damages under Virginia Code § 59.1-68.3.  *See* Va. Code Ann. § 59.1-68.3 (2007) (providing a cause of action for any person who suffers a loss resulting from a violation of Virginia Code § 18.2-214, *et seq.*).

Plaintiff contends that questions of material fact exist with respect to whether certain statements made by Martinsville in its advertising material were true.  Specifically, plaintiff contests the veracity of two statements, namely, "[n]ot one penny of insured savings has ever been lost by a member of a federally insured credit union," and "[a] surety bond covers money and valuable papers against robbery, forgery and dishonesty."  Pl.'s Opp'n 26.

Defendant contends that summary judgment should be granted on this count because plaintiff has not demonstrated that any of Martinsville's statements are false.  A plaintiff need not prove his case in the opposition to defendant's motion for summary judgment, but rather, the plaintiff must identify material questions of fact surrounding his claim.  *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).  Viewing the facts in the light most favorable to plaintiff, the Court finds that

20

plaintiff has identified potentially misleading statements made by Martinsville, and material questions of fact remain as to whether those statements constituted deceptive advertising.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Therefore, defendant's motion for summary judgment with respect to Count VI shall be denied.

### G.   Count VII (Unlawful Trade Practices)

In Count VII, plaintiff attempts to state a claim for "unlawful trade practices," and alleges that Martinsville "acted with tortuous interference, advancing spurious defenses, being uncooperative with law enforcement officials, failing to provide legible copies of the forged checks."  Compl. ¶¶ 12, 47.  While plaintiff has attempted to state a claim pursuant to the District of Columbia Consumer Procedures and Protection Act, this statute is inapplicable to the foregoing dispute, as Virginia law governs the relationship between the parties.  *See supra* 6-8.  Further, although Virginia's Consumer Protection Act arguably could be applied to Plaintiff's claims, the Act expressly excludes credit unions from its coverage, such that any claim alleged by Plaintiff against Martinsville for unlawful trade practices is without merit.  *See* Va. Code Ann. § 59.1-199 (D) (2007) ("Nothing in [the Virginia Consumer Protection Act] shall apply to: Banks, savings institutions, credit unions, small loan companies, . . . .").  Therefore, defendant's motion for summary judgment on Count

VII shall be granted.

H.   **Count VIII (Negligent Misrepresentation, Deceit, Fraud and Constructive Fraud)**

Plaintiff alleges in Count VIII of his complaint that Martinsville is liable for negligent misrepresentation, deceit, fraud, and constructive fraud, on account of "the Credit Union's inaccurate and false description of the protections on his account, including the actions taken with the check reporting agencies constituted negligent misrepresentation."  Compl. ¶ 50.

There is no basis for plaintiff's claim of negligent misrepresentation under Virginia law.  *See Bentley v. Legent Corp.*, 849 F. Supp. 429, 434 (E.D. Va. 1994) (holding that defendant's claim for negligent misrepresentation failed because Virginia does not recognize this tort).  *See also Herman v. Legent Corp.*, 50 F.3d 6 (4th Cir. 1995); *Haigh v. Matsushita Elec. Corp. of Am.*, 676 F. Supp. 1332, 1349-50 (E.D. Va. 1987).

Virginia courts have, however, recognized "negligent misrepresentation" in the context of constructive fraud.  *See Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 507 S.E.2d 344, 347 (Va. 1998) (stating that that "[t]he essence of constructive fraud is negligent misrepresentation").  To prevail on a claim for constructive fraud, a plaintiff must show that "a false representation of a material fact was made innocently or negligently, and the injured party was damaged as a result of his

reliance upon the misrepresentation." *Mortarino v. Consultant Eng'g Servs.*, 467 S.E.2d 778, 782 (Va. 1996).

Plaintiff also alleges that the defendant committed fraud. To prevail on a claim for actual fraud, a plaintiff must establish that there was: (1) a false representation of a material fact; (2) made intentionally and knowingly with intent to mislead; (3) reliance by the party misled; and (4) resulting damage to the party misled. *See Richmond Metro. Auth.*, 507 S.E.2d at 346.

Plaintiff contends the following facts are in dispute with respect to plaintiff's claims of fraud and constructive fraud: (1) Terry Hammond, the Credit Union's Controller, misrepresented that the checks would not be negotiable and that the checks would be flagged so that they would not be paid; and (2) the Credit Union also misrepresented the stability of the Credit Union and its services, when they are not in fact as stable and protective of members' assets as they claim to be. Plaintiff alleges that he relied on these misrepresentations to his detriment, and claims that he would have closed his account if he knew that the only protection for his account was the stop payment order.

Although the Credit Union disputes plaintiff's reliance on the alleged statements, and whether these statements constituted misrepresentations, deceit, fraud, or constructive fraud, plaintiff has identified issues of material fact in dispute.

23

Thus, defendant's motion for summary judgment shall be granted with respect to plaintiff's claim for negligent misrepresentation, but denied with respect to plaintiff's claims for fraud and constructive fraud.

### I.   Counts IX (Bad Faith) and X (Breach of Covenant of Good Faith and Fair Dealing)

In Counts IX and X, respectively, Plaintiff purports to state claims for "bad faith" and the breach of "the covenant of good faith and fair dealing."  Both counts are based on the same allegations, namely Martinsville's alleged refusal to honor its promises, failure to follow the requirements of the U.C.C., negligence, and breach of its duties of care.  *See* Compl. ¶¶ 52, 54.  Neither Count presents a cognizable claim under Virginia law.

While the duty of good faith and fair dealing exists under the U.C.C. as part of every commercial contract, the failure to act in good faith does not amount to an independent tort.  *See* Va. Code Ann. § 8.1A-304 (2007) (providing that every contract within the UCC imposes an obligation of good faith); *Charles E. Brauer Co., Inc. v. NationsBank of Virginia, N.A.*, 466 S.E.2d 382, 385 (Va. 1996) (holding, under predecessor statute to § 8.1A-304, that failure to act in good faith does not amount to independent tort).  On this basis, Plaintiff cannot state an independent cause of action for "bad faith" and/or the breach of "the covenant of good faith and fair dealing," and defendant's

motion shall be granted with respect to Counts IX and X.

**J.   Count XI (Defamation)**

In count XI, plaintiff alleges that the Credit Union "defamed him by stating to police and regulators that he was offered a settlement, when he was not, and by stating that Mr. Adams was advised to close his account." Compl. ¶ 56.  The necessary elements of the tort of defamation are (1) publication, (2) an actionable statement, and (3) the requisite intent. *See Chapin v. Greve*, 787 F. Supp. 557, 562 (E.D. Va. 1992), *aff'd sub. nom., Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087 (4th Cir. 1993).  To be actionable, a statement must be both false and defamatory. *See Chapin*, 993 F.2d at 1092 (quoting Restatement (Second) of Torts § 559). Further, "good pleading requires that the exact words spoken or written must be set out in the declaration *in haec verba*. Indeed, the pleading must go further, --that is, it must purport to give the exact words." *Fuste v. Riverside Healthcare Ass'n*, 575 S.E.2d 858, 862 (Va. 2003) (quoting *Federal Land Bank of Baltimore v. Birchfield*, 3 S.E.2d 405, 410 (Va. 1939)).

In Count XI, Plaintiff has not identified any specific statements to support a claim for defamation.  In his Complaint, Plaintiff relied on his assumption or belief that the Credit Union must have defamed him, rather than on any specific allegations of defamatory statements.  Moreover, plaintiff was

unable to identify any allegedly defamatory statements in his brief in opposition to defendant's motion for summary judgment. Because plaintiff's defamation claim is merely based on his "assumptions" and "belief" rather than on facts, it fundamentally lacks any factual or legal basis.  Count XI shall therefore be dismissed with prejudice.

### K.   Count XII (Emotional Distress)

Plaintiff alleges that Martinsville's actions "have caused [him] cognizable emotional distress damages, as its conduct was willful and wanton."  Compl. ¶ 58.  Plaintiff further alleges in his declaration, that he has suffered "high levels of emotional distress and many sleepless nights."  Adams Decl. ¶ 9.

As a general rule in Virginia, in tort cases, absent accompanying physical harm or wanton and willful conduct, emotional distress damages are not recoverable.  *Carstensen v. Chrisland Corp.*, 442 S.E.2d 660, 668 (1994) (citing *Sea-Land Serv., Inc. v. O'Neal*, 297 S.E.2d 647, 653 (1982)(holding that damages for emotional distress are not recoverable in an action for breach of contract, absent proof of physical injury or wanton or willful conduct amounting to separate tort); *Womack v. Eldridge*, 210 S.E.2d 145, 147 (1974)(noting that where plaintiff has alleged a tort, the general rule is that, in the absence of accompanying physical harm or wanton and willful conduct, emotional distress damages are not recoverable)).

26

Although plaintiff alleges he has had "many sleepless nights," this does not rise to the level of physical harm as contemplated by Virginia Courts. *See Russo v. White*, 400 S.E.2d 160, 163 (Va. 1991) (holding that plaintiff's allegations that she was nervous, could not sleep, and experienced stress, without any allegation that plaintiff had an objective physical injury caused by the stress, did not constitute a physical injury).

Plaintiff alleges that the Credit Union engaged in willful and wanton conduct by refusing to honor its statutory duty to return plaintiff's money, and misrepresenting the safeguards on plaintiff's account.  Pl.'s Opp'n 32.  The Court finds that defendant's conduct, as a matter of law, is not wanton or willful.  *See Ferrell v. Chesapeake & Ohio Ry. Emp. Hospital Ass'n*, 336 F. Supp. 833, 835 (W.D. Va. 1971) (holding that conduct is wanton and willful when it exceeds all bounds tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind).

Moreover, to the extent that plaintiff is seeking a recovery for emotional distress as an element of his damages, such recovery is barred by the U.C.C.  Virginia Code § 8.1A-305(a) specifically provides that "neither consequential or special damages nor penal damages may be had except as specifically provided in the U.C.C. or by other rule of law."  Va. Code §

8.1A-305(a).  Accordingly, Count XII alleging emotional distress shall be dismissed with prejudice.

### L.    Count XIII (Defamation)

Plaintiff's claim for defamation is preempted by the FCRA. 15 U.S.C. § 1681t(b)(1)(F) provides for the preemption of any state law claims with respect to any subject matter regulated under 15 U.S.C. § 1681s-2.[12]  Section 1681s-2(a) prohibits furnishing "any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe the information is inaccurate."  15 U.S.C. § 1681s-2(a)(1)(A).  Section 1681s-2(d) provides that the responsibilities of the Credit Union, as a furnisher of information under subsection (a), "shall be enforced exclusively . . . by the Federal agencies and officials and the State officials identified in section 621 [15 U.S.C. § 1681s]."

Plaintiff alleges in Count XIII that the Credit Union reported Plaintiff's account to ChexSystems for "SUSPECTED FRAUD ACTIVITY," and that this information is false and was reported with malice and/or willful intent to injure Plaintiff.  Compl. ¶¶ 60-61.  As such, the acts upon which Plaintiff bases his defamation claim against the Credit Union fall squarely within

---

[12] 15 U.S.C. § 1681t(b)(1)(F) provides that "No requirement or prohibition may be imposed under the laws of any State (1) with respect to any subject matter regulated under . . . (F) section 623 [15 U.S.C. § 1681s-2] of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies . . . ."

those proscribed by Section 1681s-2(a), and therefore are preempted.  Thus, defendant's motion for summary judgment on Count XIII is granted.

**M.   Count XIV (Violations of Fair Credit Reporting Act)**

In Count XIV, Plaintiff alleges that on September 29, 2005 the Credit Union violated the Fair Credit Reporting Act ("FCRA") by accessing his ChexSystems report without a permissible purpose in violation of the FCRA and under false pretenses. *See* Compl. ¶ 63.  Martinsville contends that it accessed plaintiff's ChexSystem report, pursuant to Section 1681b of the FCRA, to investigate a claim made by plaintiff's counsel that ChexSystems was reporting inaccurate information about Plaintiff based on information supplied to it by the Credit Union.[13]  Def.'s Mot. for Summ. J. 11-12.  Plaintiff contends that it was not until after Martinsville accessed his ChexSystem report that his lawyer informed Martinsville that there was inaccurate information on the report.  Pl.'s Opp'n 6-7.  Thus, a dispute of material facts exists as to whether Martinsville had a legitimate reason to access plaintiff's ChexSystem report.  Defendant's motion for summary judgment on Count XIV shall be denied.

---

[13] Section 1681b(a)(3)(A) provides that it is permissible for a consumer reporting agency, such as ChexSystems, to furnish a consumer report to a person which it has reason to believe intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished, and involving the extension of credit to, or review or collection of an account of, the consumer. 15 U.S.C. § 1681b(a)(3)(A).

### N.   Count XV (Invasion of Privacy)

Defendant contends that Plaintiff did not state a claim for invasion of privacy under Virginia law.  Virginia Code § 8.01-40 sets forth the only remedy under Virginia law for a claim of invasion of privacy.[14]  *See Wiest v. E-Fense, Inc.*, 356 F. Supp. 2d 604, 610-12 (E.D. Va. 2005); *Williams v. Newsweek, Inc.*, 63 F. Supp. 2d 734, 736 (E.D. Va. 1999), aff'd, 202 F.3d 262 (4th Cir. 1999); *WJLA-TV v. Levin*, 564 S.E.2d 383, 395 (Va. 2002) (recognizing that of the common law torts for invasion of privacy the Virginia General Assembly only codified misappropriation of name or likeness for commercial purposes, implicitly excluding invasion of privacy torts recognized in other jurisdictions). Defendant argues that Plaintiff did not allege any facts in support of a statutory claim for invasion of privacy, and as no further claims exist under Virginia common law, Count XV should be dismissed with prejudice.

It is clear from plaintiff's complaint that his invasion of privacy claim is not premised on a misappropriation of his name or likeness for commercial purposes.  Thus, the defendant's motion shall be granted with respect to Count XV.

---

[14] Virginia Code § 8.01-40 provides that a person whose name is used for advertising purposes or for the purposes of trade without first obtaining the person's consent may sue for an injunction preventing use of his name and for damages for injuries, as well as exemplary damages if the defendant shall have knowingly used the name in a forbidden manner.

**IV.   Conclusion**

In light of the foregoing, defendant's motion for summary judgment shall be **GRANTED** with respect to Counts II, III, V, VII, part of VIII, IX, X, XI, XII, XIII, XV, and **DENIED** with respect to Counts I, IV, VI, part of VIII, XIV.  Plaintiff's motion for summary judgment is partially **GRANTED** with respect to Count I and the October 2003 checks, and partially **DENIED** with respect to the Count I and the July 2003 checks.  An appropriate order accompanies this memorandum opinion.


Signed:     **EMMET G. SULLIVAN**
            **United States District Judge**
            **August 29, 2008**

31